**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HONORABLE JEFFREY P. MINEHART, | : | Civil Action No. 17-cv-3349 |
| Plaintiff, | : | |
| v. | : | District Judge Anita Brody |
| ANN MCELHINNEY, *et al.*, | : | |
| Defendants. | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**FOX ROTHSCHILD LLP**
Michael K. Twersky
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Telephone: (215) 299-2000
Fax: (215) 299-2150
mtwersky@foxrothschild.com

Jonathan D. Christman
Benjamin H. McCoy
10 Sentry Parkway
Suite 200, P.O. Box 3001
Blue Bell, PA 19422
Fax: (610) 397-0450
jchristman@foxrothschild.com
bmccoy@foxrothschild.com

*Attorneys for Defendants
Regnery Publishing and
Salem Media Group, Inc.*

**BALLARD SPAHR LLP**
Michael Berry
Paul J. Safier
Elizabeth Seidlin-Bernstein
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
Telephone: (215) 665-8500
Fax: (215) 864-8999
berrym@ballardspahr.com
safierp@ballardspahr.com
seidline@ballardspahr.com

*Attorneys for Defendants Ann McElhinney,
Phelim McAleer, and Ann & Phelim Media*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ........................................................................... 3

I.     The Book............................................................................................... 3

II.    Judge Minehart And This Lawsuit....................................................... 6

ARGUMENT ................................................................................................... 8

I.     The Book's Depiction Of Judge Minehart Is Not Actionable As A Matter Of Law.......... 8

     A.    The Law Governing Defamation And False Light Claims.................................... 9

     B.    The Implications Judge Minehart Ascribes To The Book Are Not Reasonable ........................................................................... 11

     C.    None Of The Specific Statements Judge Minehart Challenges Is Actionable ............................................................................... 16

          1.    The First Passage Is Not Actionable......................................... 16

          2.    The Second Passage Is Not Actionable ...................................... 22

II.    Judge Minehart Cannot Plausibly Plead Actual Malice .................................... 24

III.   Judge Minehart's Civil Conspiracy Claim Must Be Dismissed ....................... 30

CONCLUSION................................................................................................ 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Wisconsin Airlines Corp. v. Hoeper*,
    134 S. Ct. 852 (2014) ............................................................................................. 10

*Arsenal, Inc. v. Ammons*,
    2014 WL 6771673 (E.D. Pa. Dec. 2, 2014) .......................................................... 31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................ 28

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ 28

*Beverly Enterprises, Inc. v. Trump*,
    182 F.3d 183 (3d Cir. 1999) ................................................................................... 11

*Biro v. Condé Nast*,
    807 F.3d 541 (2d Cir. 2015) ................................................................................... 26

*Bogash v. Elkins*,
    176 A.2d 677 (Pa. 1962) ................................................................................... 11, 16

*Bukstel v. Hand*,
    644 F. App'x 110 (3d Cir. 2016) ............................................................................ 21

*Curran v. Children's Service Center of Wyoming County, Inc.*,
    578 A.2d 8 (Pa. Super. 1990) ................................................................................. 10

*Dodds v. American Broadcasting Co.*,
    145 F.3d 1053 (9th Cir. 1998) ................................................................................ 19

*Doltz v. Harris & Associates*,
    280 F. Supp. 2d 377 (E.D. Pa. 2003) ..................................................................... 30

*Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*,
    2015 WL 1163787 (M.D. Pa. Mar. 13, 2015) ....................................................... 26

*Ferreri v. Plain Dealer Publishing Co.*,
    756 N.E.2d 712 (Ohio Ct. App. 2001) ................................................................... 19

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) .................................................................................................. 24

*Goldstein v. Phillip Morris, Inc.*,
    854 A.2d 585 (Pa. Super. 2004) ............................................................................30

*Green v. Mizner*,
    692 A.2d 169 (Pa. Super. 1997) ............................................................................11

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989) .............................................................................................27

*Hill v. Cosby*,
    665 F. App'x 169 (3d Cir. 2016) .............................................................................9

*Innovasystems, Inc. v. Proveris Scientific Corp.*,
    2014 WL 3887746 (D.N.J. Aug. 6, 2014) ...........................................................26

*Jankovic v. International Crisis Group*,
    822 F.3d 576 (D.C. Cir. 2016) ..............................................................................27

*Jenkins v. KYW*,
    829 F.2d 403 (3d Cir. 1987) ...........................................................11, 12, 19, 24

*Kendall v. Daily News Publishing Corp.*,
    716 F.3d 82 (3d Cir. 2013) ...................................................................................24

*Kernick v. Dardanell Press*,
    236 A.2d 191 (Pa. 1967) .......................................................................................21

*Kerrigan v. Otsuka America Pharmaceutical, Inc.*,
    560 F. App'x 162 (3d Cir. 2014) ..........................................................................10

*Larsen v. Philadelphia Newspapers, Inc.*,
    543 A.2d 1181 (Pa. Super. 1988) ........................................................................25

*Lee v. TMZ Productions Inc.*,
    710 F. App'x 551 (3d Cir. 2017) .....................................................................25, 26

*Lin v. Rohm & Haas Co.*,
    293 F. Supp. 2d 505 (E.D. Pa. 2003) .....................................................................9

*Livingston v. Murray*,
    612 A.2d 443 (Pa. Super. 1992) ...........................................................................11

*Manning v. WPXI, Inc.*,
    886 A.2d 1137 (Pa. Super. 2005) ........................................................................25

*Marcone v. Penthouse International Magazine for Men*,
    754 F.2d 1072 (3d Cir. 1985) .....................................................................4, 11, 13

*Marin v. Erie Times*,
525 F. App'x 74 (3d Cir. 2013) ................................................................ 10

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991).................................................... 10, 17, 23, 25

*Mayfield v. NASCAR*,
674 F.3d 369 (4th Cir. 2012) ................................................................ 26

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) .............................................................. 26

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ............................................................................ 9, 17

*Neish v. Beaver Newspapers, Inc.*,
581 A.2d 619 (Pa. Super. 1990) ........................................................... 10

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ....................................................................... 24, 25

*Parano v. O'Connor*,
641 A.2d 607 (Pa. Super. 1994) .................................................. 9, 10, 17

*Perez v. Factory Direct of Secaucus, LLC*,
2013 WL 5770734 (D.N.J. Oct. 23, 2013) ........................................... 26

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) .............................................................................. 10

*Pippen v. NBCUniversal Media, LLC*,
734 F.3d 610 (7th Cir. 2013) ......................................................... 26, 29

*Rappaport v. VV Publishing Corp.*,
637 N.Y.S.2d 109 (N.Y. App. Div. 1996) ....................................... 18, 19

*Redco Corp. v. CBS, Inc.*,
758 F.2d 970 (3d Cir. 1985) ................................................................. 12

*Reese v. Pook & Pook, LLC*,
158 F. Supp. 3d 271, 296 (E.D. Pa. 2016) ....................................... 9, 26

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002) ................................................................ 18

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
366 N.E.2d 1299 (N.Y. 1977) ................................................................ 1

*Rush v. Philadelphia Newspapers, Inc.*,
    732 A.2d 648 (Pa. Super. 1999) .................................................................................25

*Sarkees v. Warner-West Corp.*,
    37 A.2d 544 (Pa. 1944) ...................................................................................10, 11

*Sarpolis v. Tereshko*,
    625 F. App'x 594 (3d Cir. 2016) .............................................................................30

*Schatz v. Republican State Leadership Committee*,
    669 F.3d 50 (1st Cir. 2012) ...............................................................................26, 29

*Schiavone Construction Co. v. Time, Inc.*,
    847 F.2d 1069 (3d Cir. 1988) .................................................................................25

*Scott-Taylor, Inc. v. Stokes*,
    229 A.2d 733 (Pa. 1967) ........................................................................................21

*Snook v. Midd-West School District*,
    2015 WL 1209756 (M.D. Pa. Mar. 16, 2015) .......................................................26

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..................................................................................................1

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ..........................................................................................25, 28

*St. Surin v. Virgin Islands Daily News, Inc.*,
    21 F.3d 1309 (3d Cir. 1994) ...................................................................................26

*Standing Committee on Discipline of the U.S. District Court for the Central*
    *District of California v. Yagman*,
    55 F.3d 1430 (9th Cir. 1995) ..................................................................................17

*Strickland v. University of Scranton*,
    700 A.2d 979 (Pa. Super. 1997) .............................................................................30

*Taha v. Bucks County*,
    2015 WL 9489586 (E.D. Pa. Dec. 30, 2015) ........................................................27

*Thomas Merton Center v. Rockwell International Corp.*,
    442 A.2d 213 (Pa. 1981) ........................................................................................11

*ToDay's Housing v. Times Shamrock Communications, Inc.*,
    21 A.3d 1209, 1215 (Pa. Super. 2011) .............................................................11, 13

*Tucker v. Fischbein*,
    237 F.3d 275 (3d Cir. 2001) .........................................................................25, 28, 29

*Tucker v. Philadelphia Daily News,*
    848 A.2d 113 (Pa. 2004) .............................................................................................. 9

*Warkevicz v. Berwick Area School District,*
    2016 WL 3753108 (M.D. Pa. July 14, 2016) ........................................................... 10

*Zartman v. Lehigh County Humane Society,*
    482 A.2d 266 (Pa. Super. 1984) ................................................................................ 16

**Other Authorities**

*Almanac of the Federal Judiciary, Judges of the U.S. District Court for the
    Eastern District of Pennsylvania* ............................................................................. 19

Pa. Judicial Ethics Committee of the Pa. Conference of State Trial Judges,
    Formal Op. 2014-1 ...................................................................................................... 21

Defendants Ann McElhinney, Phelim McAleer, Ann and Phelim Media, LLC, Salem Media Group, Inc. ("Salem"), and Regnery Publishing ("Regnery")[1] (collectively, the "Defendants"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their consolidated Motion to Dismiss all claims in Plaintiff's Complaint.

## INTRODUCTION

Speech about matters of public concern lies "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (citation omitted). This case centers on quintessential speech about a matter of significant public concern – a book that sheds light on the national debate about abortion by recounting the investigation and prosecution of Dr. Kermit Gosnell, the notorious abortion doctor convicted of first-degree murder.

The plaintiff in this case is not Gosnell or any of the people who worked at his clinic or who are the subject of the book's sharp criticism. Rather, this case was brought by the Judge who presided over the trial where Gosnell's crimes were brought to light and Gosnell was brought to justice. Years ago, the New York Court of Appeals observed, in a decision directing that a libel lawsuit brought by a sitting judge be dismissed: "'Judges are supposed to be [people] of fortitude, able to thrive in a hardy climate.' Judicial office is not a place for those who are oversensitive to comments made in the public press." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1306 (N.Y. 1977) (quoting *Craig v. Harney*, 331 U.S. 367, 376 (1947)). The Honorable Jeffrey Minehart, the plaintiff in this action, apparently disagrees.

Judge Minehart filed this lawsuit based on two fleeting passages in the 318-page book *Gosnell – The Untold Story of America's Most Prolific Serial Killer* (the "Book"). He contends that those two isolated passages accuse him of "being a drunk, broken down hack Judge," who

---

[1] Regnery Publishing is a registered trade name of Caron Broadcasting, Inc. and not a separate, distinct legal entity.

"broke the law, violated his oath of office, . . . obstructed justice," and "sympathized with a mass murderer of Hitleresque proportions." Compl. ¶¶ 187, 190, July 27, 2017, Dkt. 1-4. Based on his unreasonable and forced interpretation of the two passages, Judge Minehart has brought claims for defamation, false light invasion of privacy, and civil conspiracy.

Those claims fail as a matter of well-established constitutional and common law for the following reasons:

*First*, nothing the Book says about Judge Minehart, either directly or by implication, is actionable. Judge Minehart attempts to create claims by removing the challenged passages from their context and inviting this Court to ignore the rest of the Book. That effort flouts well-established law that requires the passages to be read in context and the Book to be viewed as a whole. In recounting Gosnell's trial, the Book makes clear that Judge Minehart faithfully applied the law, underscored key evidence against Gosnell, ruled against Gosnell at a critical juncture, and ultimately oversaw the trial that resulted in Gosnell's conviction – despite the prosecution's many concerns about its prospects at trial and the novel legal theories it pursued against Gosnell. Simply put, the implications Judge Minehart ascribes to the Book are not reasonable. What the Book actually does say about Judge Minehart cannot give rise to claims for defamation or false light as the challenged passages do not contain materially false facts, are not defamatory or highly offensive, and reflect subjective opinions protected by the Constitution.

*Second*, the First Amendment demands that a public official like Judge Minehart establish that any alleged defamation was published with actual malice – that is, with subjective knowledge of falsity or serious doubts as to the truth of those statements. The Constitution sets this high burden to protect the free flow of information about matters of public concern, like the issues addressed by the Book. Pennsylvania law requires that all plaintiffs pursuing false light

claims meet this same high standard.  Here, Judge Minehart has not pleaded, and cannot plead, that any of the challenged statements were published with actual malice.  Indeed, the various facts he has pleaded show that his claims fall well short of that constitutional standard.

*Third*, Judge Minehart cannot state a claim for civil conspiracy, both because he cannot state a claim for any underlying tort, and because, as set forth in this Court's February 14, 2018 Order (the "Feb. 14 Order"), Dkt. 40, his counsel has admitted the purpose of the alleged conspiracy was not to harm Judge Minehart, but rather "to advance an anti-abortion agenda." *Id.* at 4-5

Accordingly, Defendants' respectfully request that Judge Minehart's claims be dismissed with prejudice.

## FACTUAL BACKGROUND

### I.     The Book

This lawsuit arises out of the book *Gosnell – The Untold Story of America's Most Prolific Serial Killer*.  As suggested by its title, the Book tells the story of Kermit Gosnell, the notorious Philadelphia physician whose practice centered on performing illegal and dangerous late-term abortions under horrific conditions.   The Book details Gosnell's lengthy career and the investigation that uncovered his crimes, beginning with the tragic death of one of his patients following an abortion and the macabre evidence found in his clinic, including "bags of fetal remains that reached the ceiling," and jars of babies' feet that Gosnell had cut off and kept in the clinic's refrigerator.  Compl. Ex. 1 (B) (Book) at 22, 28, 32.  The Book then describes the grand jury proceedings, which led to Gosnell being charged with seven counts of first-degree murder, two counts of infanticide, and conspiracy to commit murder.  *Id.* at 159.  And, finally, the Book recounts Gosnell's trial, conviction, and sentencing for murder.

Because of the length of the Book, Defendants cannot do much more here than convey its general themes and narrative. However, a PDF copy of the Book is attached as Exhibit B to Judge Minehart's Complaint, and Defendants have, with Judge Minehart's consent, provided the Court with hardcopies of it. *Defendants encourage the Court, in considering this motion, to read the Book in its entirety*, as the full Book provides the "context" required under well-established case law. *See, e.g., Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985) (requiring "that the allegedly libelous communication be read as a whole, in context.").

The Book's narrative is largely told from the perspective of the investigators and prosecutors who worked on Gosnell's case. Much of the Book's drama involves tracking their work to uncover Gosnell's crimes and their subsequent efforts to overcome the many obstacles to stopping his illegal practices and bringing him to justice. Through that story, the Book contributes to the national conversation about abortion. *See, e.g.*, Compl. Ex. 1 (B) (Book) at xvii-xx (Preface of the Book). Specifically, the Book pursues two main themes:

First, the Book posits that Gosnell was able to continue his crimes for as long as he did in large part because an array of people and entities – like the **Pennsylvania** Departments of State and Health, police, and even some in the medical community – failed to subject Gosnell's clinic to proper oversight. *See, e.g.*, Compl. ¶¶ 66-70 (detailing instances of the Book pursuing this theme). For instance, Chapter 3 of the Book, titled "Dereliction of Duty," recounts in vivid **detail the repeated** failures of the Pennsylvania Department of Health to subject Gosnell's work to scrutiny. According to the Book, the Department disregarded multiple **warnings** about the horrible conditions of Gosnell's clinic, the deplorable quality of his care, and the harm he inflicted on his patients. *See, e.g.*, Compl. Ex. 1 (B) (Book) at 68-83 (cataloging warnings); *see also id.* at 73 ("State officials who were supposed to monitor and regulate Gosnell missed many

opportunities to inspect and stop America's biggest serial killer."). The Book contends that the Department's failures stemmed from a desire to stay away from the politically charged subject of abortion. *See, e.g.*, *id.* at 82-83. This theme is pursued throughout the first half of the Book, before Gosnell has been charged and the narrative shifts to the courtroom. *See, e.g.*, *id.* at 24 ("It's difficult to find the right word to describe the Department of Health's functionaries and their judgment that night, but despicable, unconscionable, criminal, inexcusable, and morally bankrupt all come to mind."); *id.* at 55 ("Medical professionals didn't want to contribute to any official proceeding that might shine a negative light on abortion."); *see also id.* at 15-16, 34, 40, 43-44, 64-80, 174 (other examples on this theme).

Second, the Book accuses the national media of ignoring Gosnell's prosecution and trial and failing to appreciate their significance to the larger debate over abortion. This theme is largely developed in the second half of the Book, after Gosnell has been charged and the facts about the gruesome nature of his crimes have begun to come to light. For instance, the Book notes that "[v]ery few journalists turned up" for the trial, which surprised the prosecution team, who had "wildly overestimat[ed] the media interest" in the case. *Id.* at 181. The Book states that, while "[c]onservative new media and pro-life activists reported the Gosnell case from the very beginning," *id.* at 244, the case was not covered by the national "mainstream media," *id.* at 251-52; *see also, e.g.*, *id.* at 181 (noting "the dearth of reporting on the case"); *id.* at 251 (discussing "the media's blackout of the Kermit Gosnell trial"); *see generally id.* at 243-267 (chapter titled "Media Malpractice"). The Book argues that the national media's lack of attention to the story, which fit the criteria for other widely covered high-profile criminal trials, reflected the "liberal" bent of the national media and its "pro-choice" bias. *Id.* at 254, 257.

## II.     Judge Minehart And This Lawsuit

Judge Minehart, a sitting Judge of the Court of Common Pleas in Philadelphia County, presided over Gosnell's criminal trial. Compl. ¶¶ 7, 52. As the Book makes clear, many of the facts about Gosnell's ghastly crimes were first brought to light in Judge Minehart's courtroom. *See, e.g.*, Compl. Ex. 1 (B) (Book) at 162 (explaining that "[w]e know the most about the stories of two" of the victims of infanticide "– Baby Boy A and Baby Girl Manning – because their mothers testified at Gosnell's trial"); *id.* at 133-35 (describing testimony of doctor in Gosnell's clinic who recounted "snipping the necks of babies" and estimating that "40 percent of the babies aborted at the clinic were over the gestational age limit for legal abortions in Pennsylvania"). But, Judge Minehart himself does not emerge as a character in the narrative until Chapter 7, when Gosnell is finally brought to trial. *Id.* at 175-80. That represents a crucial turning point in the Book's narrative. At that point, the long history of state administrative officials failing to detect or respond to Gosnell's crimes had passed, and the various bureaucratic obstacles to investigating and prosecuting him had been surmounted. The narrative then shifts focus to the prosecution's efforts to secure a conviction of Gosnell, and to its concerns about whether it would be able to do so, especially in light of the novelty of the legal theories it was pursuing, the vagaries in the "born-alive" law, and the pro-choice composition of the jury. *See, e.g.*, *id.* at 176-77. Ultimately, the section of the Book dealing with the trial culminates in Gosnell's conviction for first-degree murder and the life sentence with no possibility of parole imposed by Judge Minehart. *Id.* at 240.

Following the publication of the Book, Judge Minehart filed this suit against the Book's authors (Ann McElhinney and Phelim McAleer), their company (Ann and Phelim Media, LLC), the Book's publisher (Regnery), and the publisher's parent company (Salem). Compl. ¶¶ 8-12,

14-18.[2]   He has asserted claims for defamation and false light invasion of privacy against the

authors, their company, and Regnery, and a claim for civil conspiracy against all Defendants.[3]

*Id.* ¶¶ 185-98, 210-19.

Judge Minehart's defamation and false light claims arise out of only two passages in the

Book.  The first passage, which appears when Judge Minehart is first identified as the judge who

will be presiding over the trial, reads as follows:

> In addition to the benefit of a pro-abortion jury, Gosnell was lucky
> in the judge assigned to the case. In Philadelphia, as in most of the
> country, judges are selected at random to avoid any appearance of
> favoritism or conflict of interest. The prosecution team was
> dismayed to learn that Judge Jeffrey Minehart would preside over
> the case. Minehart was a former prosecutor; before he was
> appointed to the bench, in fact, he had been Ed Cameron's
> supervisor in the DA's office. But the two men never had more
> than a friendly working relationship. On the other hand, Minehart
> and Jack McMahon, Gosnell's lawyer, were drinking buddies. And
> Minehart had a reputation among prosecutors for being too easy on
> defendants and allowing defense lawyers entirely too much
> leeway. No one connected to the investigation would say so on the
> record, but some were genuinely concerned that the judge's
> friendship with the defense attorney would hurt their case.

Compl. ¶ 71; *Id.* Ex. 1 (B) (Book) at 179-80.

The second passage, which appears in a chapter of the Book titled "Media Malpractice,"

states:

> Local Philadelphia-area reporter J.D. Mullane of the Bucks County
> *Courier Times* took a picture of the empty section reserved for
> journalists the day Power's (referring to Kristen Powers of
> USAToday) column appeared.  He was risking contempt of court –
> Judge Minehart had banned all cameras from the courtroom – but

---

[2] Minehart also sued another Salem subsidiary, Pennsylvania Media Associates, Inc., ("PMA").
On February 14, 2018, the Court dismissed PMA on the ground it was fraudulently joined in this
action because Plaintiff failed to plead a civil conspiracy claim.    Feb. 14 Order.

[3] The Complaint also asserts a "claim" for a permanent injunction against all Defendants (Count
III), but no such cause of action exists.  *See, e.g.*, Feb. 14 Order at 5 n.4.

> the picture sent a powerful message. Mullane tweeted it, and it
> very quickly travelled.

Compl. ¶ 86; *Id.* Ex. 1 (B) (Book) at 256.

Judge Minehart claims that those two passages defame him and cast him in a false light by accusing him of:

- having "broke[n] the law, violated his oath office, and obstructed justice";

- being "a hack 'defense Judge' lacking in integrity," and "a hack 'drinking buddy' of the defense attorney Jack McMahon";

- "favor[ing] criminal defendants, including serial killers of new born babies like Kermit Gosnell";

- being "a hack that attempted to cover-up the Gosnell crimes, and tried to conceal the trial from the public by 'banning' cameras in the courtroom";

- being "a biased judge whose selection was opposed by the prosecutors, who expressed 'concern' and 'dismay' over his selection"; and

- "being a drunk, broken down hack Judge who sympathized with a mass murderer of Hitleresque proportions."

Compl. ¶¶ 187, 189(a)-(e), 190.   Separately, Judge Minehart claims that all of the Defendants should be held liable for civil conspiracy because they worked together to promote the Book. *See id.* ¶¶ 210-19.  As explained below, none of these claims is viable.

## ARGUMENT

### I.      The Book's Depiction Of Judge Minehart Is Not Actionable As A Matter Of Law

Nothing the Book says about Judge Minehart – either directly or by implication – can give rise to a claim for defamation or false light.  The implications Judge Minehart attributes to the Book are not reasonable.  And, the specific passages he challenges are not defamatory or highly offensive, are not materially false, and/or constitute subjective opinion.  The Book is, therefore, fully protected under well-established Pennsylvania and constitutional law.

A.     **The Law Governing Defamation And False Light Claims**

Under Pennsylvania law and the First Amendment, a publication can give rise to a claim for defamation or false light only under certain circumstances and only based on a reasonable construal of the meaning it conveys:[4]

*First*, **the challenged publication must be defamatory and highly offensive.**   A statement is defamatory only if it "tends to blacken a person's reputation and expose him to public hatred, contempt or ridicule" – that is, the statement must "grievously fracture[] [the plaintiff's] standing in the community." *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) (citations omitted).   Similarly, the false light tort requires that the statement be "highly offensive to a reasonable person," such that "the plaintiff . . . would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." *Lin v. Rohm & Haas Co.*, 293 F. Supp. 2d 505, 522 (E.D. Pa. 2003) (citation omitted).   Defamation and false light claims cannot rest on statements that are merely "annoying or embarrassing." *See, e.g.*, *Parano v. O'Connor*, 641 A.2d 607, 609 (Pa. Super. 1994).   These assessments are made by the Court as a matter of law in the first instance. *See, e.g.*, *Reese v. Pook & Pook, LLC*, 158 F. Supp. 3d 271, 296 (E.D. Pa. 2016) (dismissing claims based on publication that was neither defamatory nor highly offensive).

*Second*, **only statements or implications of verifiable fact are actionable.** *See, e.g.*, *Hill v. Cosby*, 665 F. App'x 169, 174 (3d Cir. 2016) ("statement must be provable as false to give rise to a claim of defamation") (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990)).   The First Amendment protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20 (citation omitted).   Thus, a

---

[4] In addition to the requirements articulated here, a public official asserting claims for defamation or false light must show that the statements were published with "actual malice," as explained more fully below. *See infra* at 24-30.

statement is not actionable if it "reveal[s] [a defendant's] subjective interpretation, or opinion." *Parano*, 641 A.2d at 609; *see also Neish v. Beaver Newspapers, Inc.*, 581 A.2d 619, 624-25 (Pa. Super. 1990). Whether a statement is one of objective fact or subjective opinion is a threshold question of law. *See, e.g., Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 168 (3d Cir. 2014); *Warkevicz v. Berwick Area Sch. Dist.*, 2016 WL 3753108, at *14–15 (M.D. Pa. July 14, 2016) (dismissing false light claim based on opinion).

**Third, the challenged factual statements must be materially false.** *See, e.g., Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861, 863 (2014); *Curran v. Children's Serv. Ctr. of Wyo. Cty., Inc.*, 578 A.2d 8, 13 (Pa. Super. 1990) (false light requires "major misrepresentation"); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (plaintiff "bear[s] the burden of showing falsity"). A plaintiff cannot state a claim where the "gist" or "sting" of the challenged statement is substantially true, and a "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) (citation omitted). In other words, whether a falsehood is material depends on whether the falsehood itself "affects the subject's reputation" relative to the actual truth. *Air Wis.*, 134 S. Ct. at 863.

**Fourth, in deciding whether these elements have been met, the challenged publication must be accorded its reasonable meaning.** In particular, a court must "fairly and reasonably" construe the publication according to "the natural meaning of the words." *Sarkees v. Warner-W. Corp.*, 37 A.2d 544, 546 (Pa. 1944). The meaning of a publication is a question of law for the Court in the first instance. *See, e.g., Marin v. Erie Times*, 525 F. App'x 74, 77 (3d

Cir. 2013); *Jenkins v. KYW*, 829 F.2d 403, 404, 406 (3d Cir. 1987); *ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1215 (Pa. Super. 2011).

In determining whether the meaning alleged by the plaintiff is reasonable, a court must consider the challenged statements in their "full context," *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216 (Pa. 1981), and "consider the effect of the entire" publication. *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997); *Marcone*, 754 F.2d at 1078 ("The proper test . . . requires that the allegedly libelous communication be read as a whole, in context."). Context, as the Pennsylvania Supreme Court has explained, is critical: "[W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable." *Thomas Merton Ctr.*, 442 A.2d at 216 (citation omitted). A claim cannot be based on an "unfair and forced construction . . . of the publication." *Bogash v. Elkins*, 176 A.2d 677, 679 (Pa. 1962) (citation omitted). And, courts must reject a plaintiff's attempts "to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. 1992) (citation omitted). Accordingly, when the meaning alleged by the plaintiff is not reasonable, the alleged meaning must be rejected, and the plaintiff must be held to have "failed to state a claim" as a matter of law. *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d Cir. 1999); *see also Sarkees*, 37 A.2d at 546 (explaining that court must reject defamation claim "[i]f the words are not susceptible of the meaning ascribed to them by the plaintiff").

**B.      The Implications Judge Minehart Ascribes To The Book Are Not Reasonable**

The crux of Judge Minehart's claims is his contention that the two passages he challenges convey false, defamatory, and highly offensive implications. Specifically, Judge Minehart contends that the Book suggests he "broke the law, violated his oath office, and obstructed justice," "favors criminal defendants, including serial killers of new born babies like Kermit

11

Gosnell," "attempted to cover-up the Gosnell crimes," and "sympathized with a mass murderer of Hitleresque proportions." Compl. ¶¶ 187, 189(a)-(e), 190. Simply put, these alleged implications are wholly "unreasonable," *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985), and "misconstrue" the Book. *Jenkins*, 829 F.2d at 408.

Judge Minehart arrives at his slanted reading through two interpretive techniques, neither of which withstands scrutiny. First, Judge Minehart takes the very strong opinions expressed about the "corrupt and uncaring bureaucracy of state and city regulators" in the first half of the Book, Compl. ¶ 64, and suggests that those opinions are meant to apply to Judge Minehart as well. *See id.* ¶ 65 (claiming that the Book "falsely cast Judge Minehart as part of a complicit establishment"). Thus, Judge Minehart contends that the harsh language from Chapter 3 of the Book condemning the perceived moral complicity of "state health inspectors" applies equally to its portrayal of him in Chapter 7. *See, e.g., id.* ¶¶ 68-71, 190.

This tactical sleight of hand is unreasonable as a matter of law. The government officials condemned in the pre-trial portions of the narrative are those whom the Book says *prevented Gosnell from being charged with any crimes.* Judge Minehart, on the other hand, is the one who *presided over the criminal trial that resulted in Gosnell's conviction for capital murder.* Indeed, the government officials whom the Book singles out for blame are pointedly referred to in the text as "*Harrisburg* bureaucrats." *Id.* Ex. 1 (B) (Book) at 34 (emphasis added). Judge Minehart is expressly not in that group. Even the statements from the Book cited and quoted in his Complaint make this clear. *See, e.g., Id.* ¶ 68 ("Gosnell's crimes were ignored by the *police*, the *medical establishment*, and *state and local agencies* that were in a position to stop Gosnell's parade of horrors"); *id.* (quoting Book critique of "*state health inspectors*" and "*bureaucratic*

*automatons* and pathetic *paper pushers* who failed to do their jobs"); *id.* ¶ 70 n.1 (quoting Book's criticism of "*Pennsylvania Department of Health*") (emphases added).

Second, the implications alleged by Judge Minehart are based solely on the passage describing the prosecution's initial apprehension about him. *See, e.g.*, Compl. ¶¶ 187, 189(c)-(e), 190. On their face and read in isolation, these reported concerns do not suggest that Judge Minehart "broke the law, violated his oath office, and obstructed justice," "favor[ed] . . . serial killers," or "sympathized with a mass murderer," as Judge Minehart incredibly claims. *Id.* ¶¶ 187, 189(a)-(e), 190. But, more significantly, Judge Minehart's effort to base his claim solely on this one passage in isolation is contrary to well-established law, as it ignores what the Book goes on to say about how he actually conducted the trial.

The law requires the Book to be viewed as a whole and the fleeting passages Judge Minehart challenges to be read in context. *See Marcone*, 754 F.2d at 1078; *cf. ToDay's Hous.*, 21 A.3d at 1215 (series of articles did not falsely imply defamatory facts when fourth article in series expressly disabused any previous misimpression). As the Book makes clear, *none* of the prosecutor's initial worries about Judge Minehart was borne out in what actually happened at trial. The Book does not depict *any* instances of Judge Minehart exhibiting favoritism or leniency toward Gosnell or his attorney (McMahon). On the contrary, the Book's depiction of the actual trial proceedings unambiguously casts Judge Minehart in a favorable light and dispels any notion that he is a "hack Judge who sympathized with a mass murderer" or somehow "broke the law." Compl. ¶¶ 187, 190. Specifically:

1. The Book repeatedly notes that Judge Minehart underscored and clarified key portions of testimony for the jury. For example, when a witness "openly admitted to killing babies born alive" by cutting their necks, "[t]he judge interjected, 'For the record, the witness is indicating

and pointing to the back of his neck and pressing in on the back of his neck just below his scalp.'" Compl. Ex. 1 (B) (Book) at 133-36.  The Book recounts another instance during a different witness's testimony about Gosnell placing a nearly full-term, breathing baby in a box before he "'cut the back of the baby's neck.'" *Id.* at 167-68.  The Judge interjected, asking the witness:

> "When you say, 'came together,' . . . what do you mean?"
>
> "Because when Dr. Gosnell put the baby in the shoebox," [the witness] repeated, "the baby was hanging over the shoebox.'"

*Id.* at 167.

2.  The Book shows Judge Minehart's compassion for the witnesses testifying against Gosnell.  After one woman "broke down" while testifying about her experience with Gosnell, "Judge Minehart instructed the bailiff to give her some water" and took a break until "she was ready to continue." *Id.* at 173.

3.  The Book repeatedly depicts Judge Minehart's courtroom as the one place where the truth about Gosnell's crimes finally came out and its impact was allowed to be felt.  Thus, in the Book's preface, McElhinney describes the effect the trial had on her, stating:  "the images shown in the courtroom were not from activists, they were from police detectives and medical examiners . . . .  The witnesses swore an oath to tell the truth and to present the evidence, and they did, under pain of penalty for perjury." *Id.* at xviii.  Later, the Book quotes a journalist as saying: "The witnesses may have been lobbyists or pundits or ideologues or all three – but they were not allowed to be such in court.  They had to tell the truth and they had to tell it in detail." *Id.* at 189.

4.  The Book emphasizes that the Judge took care to ensure that the jurors were well informed in the law, and that the jurors "took their role seriously, and followed the judge's

instructions." *Id.* at 238; *see also id.* at 190 ("As the trial progressed the jury would come to understand the crucial distinctions in the law.").

5.  Most fundamentally, the Book makes clear that the trial over which Judge Minehart presided – including by overseeing the selection of the jury, and making rulings as to what evidence would be admitted, what charges would go to the jury, and how the jury would be instructed – resulted in an outcome that the Book unambiguously characterizes as just:  the conviction of Gosnell on capital murder charges.  *Id.* at 240.  The Book also makes clear that Gosnell's conviction was achieved despite the fact that it was not, from the prosecution's perspective, an easy case.  *See, e.g., id.* at 181, 210-13, 218 (portions of Book expressing doubt about strength of prosecution's case).

In fact, the Book's only detailed discussion of a ruling rendered by Judge Minehart notes that the decision was a blow to Gosnell and a meaningful victory for the prosecution.  That decision followed the directed verdict motion made by Gosnell's lawyer, McMahon, who "moved for Judge Minehart to dismiss all charges." *Id.* at 218; *see also id.* at 220-21 (detailing McMahon's arguments); *id.* at 224 ("McMahon had also asked Judge Minehart to dismiss the murder charge").  Rather than rule in McMahon's favor, the Judge rejected most of his arguments on the facts and the law, and dismissed only two charges.  *Id.* at 218, 220, 224, 225. As the Book explains, "Gosnell saw the dismissal of those charges as a setback. . . . `I was worried that by dismissing some but not others that the jury would think there must be evidence for the ones that were left.'" *Id.* at 225.  In contrast, the prosecution was pleased with the ruling: "Despite the fact that they had already lost two out of seven homicide charges, they were quietly content.  Gosnell was still facing capital murder charges, and pressing the other charges, even

though they had been dismissed, had allowed the prosecution to introduce evidence that would stay with the jury." *Id.* at 225.

At bottom, what Judge Minehart has alleged is the equivalent of asking someone to come to a conclusion about how *To Kill a Mockingbird* characterizes Boo Radley without reading all the way to the end of that classic work. While the Book depicts many public officials as obstacles to the effort to stop Gosnell and bring him to justice, Judge Minehart is not included among those public officials. He is the one who presided over the trial that brought Gosnell to justice and saw that he was locked away for his crimes. A claim based on a publication's alleged implications can only proceed if the challenged publication "can *reasonably* be construed to have the libelous meaning ascribed to it by the complaining party." *Zartman v. Lehigh Cty. Humane Soc'y*, 482 A.2d 266, 269 (Pa. Super. 1984) (emphasis added). Here, the "unfair and forced" implications alleged by Judge Minehart are wholly unreasonable. *Bogash*, 176 A.2d at 679. His defamation and false light claims based on those implications should be dismissed.

**C.     None Of The Specific Statements Judge Minehart Challenges Is Actionable**

Judge Minehart also cannot state a claim for either defamation or false light based on the two challenged passages.

**1.     The First Passage Is Not Actionable**

The first passage challenged by Judge Minehart describes the prosecution's initial reaction to his assignment as judge. It reads in full as follows:

> In addition to the benefit of a pro-abortion jury, Gosnell was lucky in the judge assigned to the case. In Philadelphia, as in most of the country, judges are selected at random to avoid any appearance of favoritism or conflict of interest. The prosecution team was dismayed to learn that Judge Jeffrey Minehart would preside over the case. Minehart was a former prosecutor; before he was appointed to the bench, in fact, he had been Ed Cameron's supervisor in the DA's office. But the two men never had more than a friendly working relationship. On the other hand, Minehart

> and Jack McMahon, Gosnell's lawyer, were drinking buddies. And Minehart had a reputation among prosecutors for being too easy on defendants and allowing defense lawyers entirely too much leeway. No one connected to the investigation would say so on the record, but some were genuinely concerned that the judge's friendship with the defense attorney would hurt their case.

Compl. ¶ 71 (quoting Book at 179-80). Judge Minehart contends that this passage is false in three respects: (1) the prosecution agreed to his assignment as judge for the Gosnell trial, rather than his having been randomly assigned; (2) the public record belies any characterization of his orientation as favorable to defendants; and (3) he and McMahon are not, in fact, "drinking buddies," or even friendly. Compl. ¶¶ 75-76, 80-85. Even assuming for these purposes that everything Judge Minehart alleges here is true – *i.e.*, that he *was* assigned to the case by agreement, that his record shows many instances of conduct that was not defendant-friendly, and that he is not friends with McMahon – there is still nothing actionable in the passage.

First, any inaccuracy about whether Judge Minehart was "assigned" to the case randomly, or "assigned" by "agreement of counsel," is not material. The "sting" of this passage is that the prosecution team initially was "dismayed" and "concerned" that Judge Minehart would be presiding over the case. *Masson*, 501 U.S. at 517. But, those concerns simply reflect the prosecution's *subjective* assessment of Judge Minehart. Such an assessment is classic opinion, entitled to absolute protection. *See, e.g.*, *Milkovich*, 497 U.S. at 21-22 (liability may not be imposed for a "subjective assertion" that is not "sufficiently factual to be susceptible of being proved true or false"); *Parano*, 641 A.2d at 609 (statements that plaintiff was "adversarial, less than helpful, and uncooperative" were not actionable because they constituted "subjective interpretation, or opinion"); *see also Standing Comm. on Discipline of the U.S. Dist. Ct. for the C.D. Cal. v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (lawyer calling judge "dishonest," "ignorant," "ill-tempered," "buffoon," "sub-standard human," "right-wing fanatic," "a bully,"

and "one of the worst judges in the United States" were statements of opinion); *Rappaport v. VV Publ'g Corp.*, 637 N.Y.S.2d 109, 110 (N.Y. App. Div. 1996) (statement that judge was "biased" is opinion).

And, even if Judge Minehart was correct that "the prosecution team was not 'concerned' or 'dismayed' by [his] selection," Compl. ¶ 75, the reporting of this initial concern is not materially false or defamatory, particularly when read in the context of the entire Book. The Book makes clear that any pretrial concerns were unfounded, as it details Judge Minehart's handling of the trial and shows that he did not accord Gosnell or his lawyer favorable treatment. *See supra* at 13-16. Thus, the *most* that is being conveyed here is that the prosecution had initial, pre-trial reservations about Judge Minehart. In high-stakes, high-profile litigation, nothing is more common than lawyers going into trial worrying about all the things that could go wrong. Indeed, the chapters describing the trial repeatedly return to the theme of the prosecution's doubts about whether it could secure a conviction and its general sense that everything was stacked against it. *See, e.g.*, Compl. Ex. 1 (B) (Book) at 176 (worrying about pro-choice instincts of jury); *id.* at 180-81 (describing vulnerability of evidence and witnesses to attack by skilled defense counsel). Thus, this reporting about the prosecution's initial reservations about Judge Minehart, even if inaccurate, conveys nothing defamatory or highly offensive about him. *Cf. Riley v. Harr*, 292 F.3d 282, 291-93 (1st Cir. 2002) (accusations against plaintiff detailed in non-fiction book were non-actionable where they clearly reflected subjective "thinking" of participant to the events depicted in book).

Second, the statements that the prosecution team viewed Judge Minehart as "being too easy on defendants" and "allowing defense lawyers entirely too much leeway" are also protected opinion. The Complaint's suggestion that "[a] simple Google search of Judge Minehart's name"

18

would have proved the prosecution's assessment of his judicial record to be wrong, Compl. ¶ 82, merely underscores the statement's protected nature. Whether any particular judge's record can be characterized as "liberal," or "conservative," or "pro-plaintiff," or "pro-defendant," or "pro-prosecution" is a matter of routine and heated debate, both among lawyers and non-lawyers, with different people offering different assessments of the same judge. *See, e.g., Almanac of the Federal Judiciary, Judges of the U.S. District Court for the Eastern District of Pennsylvania* (collecting practitioners' responses on Judges in this District regarding their alleged "leanings" in civil and criminal cases).

Judge Minehart may believe that the "pro-defense" concern is an *unfair* characterization of his record. But, that characterization is a constitutionally protected one. It cannot give rise to liability. *See, e.g., Jenkins*, 829 F.2d at 409 (holding that prosecutor's critique of a judge's lenient sentence is protected opinion); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1066-68 (9th Cir. 1998) (calling judge "one of the three worst judges in the country" and "unfit" for office would be protected opinion); *Rappaport*, 637 N.Y.S.2d at 110 (statements suggesting judge was "too lenient in imposing sentences" are protected opinions); *Ferreri v. Plain Dealer Publ'g Co.*, 756 N.E.2d 712, 721 (Ohio Ct. App. 2001) (statements describing judge's conduct as "scandalous," stating he was "beyond the call of reason," and accusing him of "car[ing] a good deal more about himself and his image' than children" are protected opinions).

Third, the portions of this passage bearing on the relationship between Judge Minehart and Gosnell's lawyer (McMahon) say nothing false, defamatory, or highly offensive about Judge Minehart. As an initial matter, Judge Minehart's suggestion that the passage accuses him of being a "drunk," Compl. ¶ 190, is unreasonable. The use of the phrase "drinking buddies" to characterize Judge Minehart's relationship with McMahon does not imply that Judge Minehart

has a drinking problem.  Rather, in context, it is a colloquial expression that suggests Judge Minehart and McMahon had a social relationship.  Indeed, two sentences later the passage makes clear that the prosecution's concern has nothing to do with the Judge's drinking, but, rather, that "the judge's *friendship* with the defense attorney would hurt their case."  Compl. Ex. 1 (B) (Book) at 180 (emphasis added).

In addition, the reference to Judge Minehart and McMahon being "drinking buddies" is plainly referring to their friendship in the past – when they worked together at the District Attorney's office many years before. *See id.* at 180 (contrasting the "friendly working relationship" between Judge Minehart and Ed Cameron, the lead prosecutor, when they worked together "in the DA's office" with the closer relationship of McMahon and Minehart, who "were drinking buddies" at that time).  The passage says nothing about Judge Minehart's current relationship with McMahon.

Even if the passage did say that Judge Minehart and McMahon were friends at the time of the trial, Judge Minehart's claims would not fare any better.  Even so understood, nothing in the statement imputes any misconduct to Judge Minehart.  For instance, there is nothing in the Book that suggests Judge Minehart engaged in any unprofessional conduct or exhibited favoritism toward McMahon or his client. *See supra* at 13-16.  In fact, the Book's description of what happened at the trial between Judge Minehart and McMahon is consistent with what Judge Minehart's Complaint alleges – "their interactions during the trial displayed 'no friendship' whatsoever."  Compl. ¶ 84; *see, e.g., id.* Ex. 1 (B) (Book) at 195 (noting that McMahon's "strategy throughout the trial was attack first and ask the judge's permission later").

Finally, unconnected to any allegation of misconduct, the suggestion that Judge Minehart and McMahon (who is described as "widely regarded as the best defense lawyer in

Philadelphia," *id.* Ex. 1 (B) (Book) at 180) had a social relationship outside of the courtroom is not defamatory or highly offensive. Judge Minehart admits that the two worked with one another in the District Attorney's office and have known each other for years. Compl. ¶¶ 57, 59. It is not uncommon, let alone scandalous, for judges and prominent members of the bar to run in the same circles, appear at events together, or otherwise socialize as friends. Indeed, such conduct is expressly permitted. *See, e.g.*, Pa. Judicial Ethics Committee of the Pa. Conference of State Trial Judges, Formal Op. 2014-1 (entitled "Social Activities"), *available at http://ethics.pacourts.us/formal.htm#2014-1*; *cf. Bukstel v. Hand*, 644 F. App'x 110, 111 (3d Cir. 2016) (per curiam) (affirming district court's denial of motion to recuse and noting that "[t]ypically, a judge need not recuse merely because he or she is friends with an attorney in the case"). Thus, there is nothing in the statement's depiction of Judge Minehart's relationship with McMahon that would cause Judge Minehart to suffer the "kind of harm which has grievously fractured his standing in the community of respectable society." *Scott-Taylor, Inc. v. Stokes*, 229 A.2d 733, 734 (Pa. 1967). The Book's depiction of Judge Minehart's relationship with McMahon is not actionable.

The bottom line is that Judge Minehart's effort to turn this single passage into an actionable indictment of both his work presiding over the Gosnell trial specifically and his career generally lacks any support either in the actual text of the Book or the law governing defamation or false light claims. That effort should be rejected. *Cf. Kernick v. Dardanell Press*, 236 A.2d 191, 193 (Pa. 1967) ("The law stands as a guardian to protect a man's good name earned in the heat of battle, in the sweat of work, and in the laboratory of conscience, but it cannot prescribe hospitalizations for abrasions or order surgery for a hiccough.").

## 2.       The Second Passage Is Not Actionable

The second passage challenged by Judge Minehart relates to the lack of press coverage of the trial.  It reads in full as follows:

> Local Philadelphia-area reporter J.D. Mullane of the Bucks County Courier Times took a picture of the empty section reserved for the journalist[s] the day Powers's (referring to Kristen Powers of USAToday) [column] appeared.  He was risking contempt of court – Judge Minehart had banned all cameras from the courtroom, but the picture sent a powerful message. Mullane tweeted it, and it very quickly travelled.

Compl. ¶ 86 (quoting Book at 256).  Judge Minehart asserts that this passage accuses him of "attempting to 'cover-up' Gosnell's crimes," or "tr[ying] to conceal the trial from the public." *Id.* ¶¶ 90, 189(d).  He further asserts that the portion stating that "Judge Minehart had banned all cameras from the courtroom" is literally false because "Pennsylvania trial judges have no discretion as to whether to allow cameras in the courtroom." *Id.* ¶¶ 88, 89.  There is, however, nothing actionable in this passage.

First, Judge Minehart's suggestion that this passage implies that he somehow attempted to "cover up" Gosnell's crimes is unreasonable and, in fact, is contrary to the actual language of the passage, which states the exact opposite.  Just as Judge Minehart's Complaint alleges that he "reserve[d] multiple seating rows in the courtroom for members of the press," *id.* ¶ 55, the passage at issue specifically informs readers that the Judge "reserved" a "section" of the courtroom "for the journalists." *Id.* Ex. 1 (B) (Book) at 256.  The Book thus makes clear that Judge Minehart did nothing to conceal the trial from the public:  He provided the press with the ability to cover it and reserved a section of the courtroom for reporters.

Second, the point of this particular passage is not that Judge Minehart prevented the public from learning the truth about Gosnell's crimes, but that the national media did so by failing to attend the trial.  That is the "powerful message" the reporter sent when he risked

contempt to tweet the photograph of "the empty section reserved for the journalists." Indeed, that is the message of the chapter in which this particular passage appears, which is titled "Media Malpractice." In fact, the pages preceding this passage bemoan "the media blackout of the case" and "the media's scandalous lack of coverage," and comments on the striking phenomenon of "serious journalists . . . trying to explain where they'd been during the early weeks of the most shocking trial of the century." *Id.* at 254-55.

That this statement is an indictment of the national media not of Judge Minehart is made explicit in the Book's first reference to this incident. In Chapter 3, the Book refers to reporter J.D. Mullane as the "Philadelphia-area reporter who covered the Gosnell case and tweeted out the famous photograph of the empty courtroom *to demonstrate the blackout of the case by the national media*." *Id.* at 83 (emphasis added). The Book thus plainly conveys that the lack of press coverage of the trial was not Judge Minehart's fault; it was a failure by the "mainstream media." *Id.* at 251. Indeed, that is one of the Book's central themes.

Third, the gist of the passage is substantially true. Judge Minehart claims that the passage is false because he had "no discretion as to whether to allow cameras in the courtroom" because a Pennsylvania Rule of Criminal Procedure provides that judges "'shall prohibit the taking of photographs . . . of any judicial proceeding.'" Compl. ¶¶ 88-89 (quoting Pa. R. Crim. P. 112). But, Judge Minehart does not dispute that he *did* ban all cameras from his courtroom. Whether Judge Minehart was compelled to impose the ban or not, the effect was the same – he "had banned all cameras from the courtroom," and the reporter who snapped the photograph "was risking contempt of court," just as the Book stated. Reporting the "pleaded truth" would not "have a different effect on the mind of the reader." *Masson*, 501 U.S. at 516-17. For all of

these reasons, no reasonable reader would conclude from this passage that Judge Minehart was trying to keep the press and public from the Gosnell trial.

In short, nothing the Book says about Judge Minehart, either directly or by implication, is actionable. Thus, his defamation and false light claims should be dismissed with prejudice.

## II.   Judge Minehart Cannot Plausibly Plead Actual Malice

As detailed above, the Book did not state or imply any false, defamatory, or highly offensive statements of fact about Judge Minehart. Even if it did, however, Judge Minehart cannot state a claim for defamation or false light because the Complaint shows that he cannot establish the Defendants published anything with actual malice.

Because Judge Minehart is a public official, he can only prevail on his defamation claim if he can plead and ultimately prove by clear and convincing evidence that Defendants published the challenged statements with "actual malice," that is, knowing the statements were false, "entertaining serious doubts as to the[ir] truth," or with a "high degree of awareness" of their "probable falsity." *See, e.g., Jenkins*, 829 F.2d at 407 (describing actual malice standard that governed state court judge's defamation claim); *Kendall v. Daily News Publ'g Corp.*, 716 F.3d 82, 89-92 (3d Cir. 2013) (same as to former Virgin Islands judge). The First Amendment requires that public officials meet this demanding standard, which permits liability only for "calculated falsehood[s]," *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964), so that those who wish to speak about, or comment on, the actions of public officials can enjoy sufficient "breathing space" to do so without fear of retribution. *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964).

As the Supreme Court has long emphasized, the actual malice standard serves our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," notwithstanding that such speech about public officials

"may well include" statements that are "vehement, caustic, and sometimes unpleasantly sharp" –
and even "erroneous." *Id.* at 270-72. Because of that, the actual malice standard has been
described as "a rigorous, if not impossible, burden to meet in most circumstances." *Manning v.
WPXI, Inc.*, 886 A.2d 1137, 1143-44 (Pa. Super. 2005) (citation omitted). Under Pennsylvania
law, actual malice is a necessary element of a false light claim, regardless of whether the plaintiff
is a public official. *See, e.g., Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa.
Super. 1988); *Rush v. Phila. Newspapers, Inc.*, 732 A.2d 648, 654 (Pa. Super. 1999) (holding
that negligence is insufficient to support a false light claim).

Significantly, the actual malice "standard is a subjective one, based on the defendant's
actual state of mind." *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1089 (3d Cir. 1988).
For there to be actual malice, the defendant must have "*actually* doubt[ed] the veracity of the
article." *Lee v. TMZ Prods. Inc.*, 710 F. App'x 551, 560 (3d Cir. 2017) (citation omitted). Thus,
"reckless disregard" of the truth cannot be equated with "recklessness" in the more familiar sense
of an "extreme departure from professional standards." *Tucker v. Fischbein*, 237 F.3d 275, 286
(3d Cir. 2001). Indeed, an alleged extreme departure from standard journalistic practices is
insufficient to establish actual malice, *id.*, as the law is "clear that reckless conduct is not
measured by whether a reasonably prudent man would have published, or would have
investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). In addition,
the concept of actual malice "should not be confused with the concept of malice as an evil intent
or a motive arising from spite or ill will." *Masson*, 501 U.S. at 510. As the Third Circuit has
instructed, "'neither . . . ill will, bias, spite, nor prejudice . . . [are] sufficient to establish either a
knowledge of the falsity of, or a reckless disregard of, the truth or falsity of the materials used.'"

*St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1317 (3d Cir. 1994).

Under the pleading rules established by the U.S. Supreme Court, when actual malice is an element of a claim, a plaintiff is required to plead more than "actual-malice buzzwords." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012); *see also Reese*, 158 F. Supp. 3d at 289 ("merely alleging actual malice is insufficient; courts are not bound to accept as true legal conclusions couched as factual allegations."). Rather, the plaintiff must plead enough facts to "show that the existence of actual malice is plausible on its face." *Earley v. Gatehouse Media Pa. Holdings, Inc.*, 2015 WL 1163787, at *2 (M.D. Pa. Mar. 13, 2015) (citation and internal quotation marks omitted). When a plaintiff fails to meet this requirement, such as when a complaint's allegations "rise to no more than professional negligence," the claims must be dismissed. *Lee*, 710 F. App'x at 560 (affirming Rule 12(b)(6) dismissal of defamation claim for, *inter alia*, failure to plausibly plead actual malice).[5]

Here, the Complaint pleads no facts that, if proven, could plausibly support Judge Minehart's conclusory assertion that "the Gosnell Book defamed Judge Minehart by making false statements of fact, knowing the same to be false, acting in reckless disregard and purposeful disregard of the truth, and thus with actual malice." Compl. ¶ 186. Instead, he pleads two theories of actual malice, each of which is inadequate as a matter of law.

---

[5] *See, e.g., Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (affirming dismissal of defamation claim where plaintiff failed to adequately plead actual malice); *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (same); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614-16 (7th Cir. 2013) (same); *Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012) (same); *Schatz*, 669 F.3d at 58 (same); *Reese*, 158 F. Supp. 3d at 289 (granting motion to dismiss based on failure to adequately plead actual malice); *Snook v. Midd-W. Sch. Dist.*, 2015 WL 1209756, at *13 (M.D. Pa. Mar. 16, 2015) (same); *Earley*, 2015 WL 1163787, at *4 (same); *Innovasystems, Inc. v. Proveris Sci. Corp.*, 2014 WL 3887746, at *5 (D.N.J. Aug. 6, 2014) (same); *Perez v. Factory Direct of Secaucus, LLC*, 2013 WL 5770734, at *7 (D.N.J. Oct. 23, 2013) (same).

First, the Complaint posits that Defendants had an economic motivation to sensationalize the facts related to Judge Minehart's conduct so as to better market the Book to their targeted audience of political conservatives. Specifically, the Complaint alleges that Defendants, in writing and publishing the Book, attempted to "shamelessly exploit[] for profit the morally divisive issue of abortion," and that, so motivated, they "fabricated facts" when "[t]he truth . . . did not jibe with [their] marketing scheme." *Id.* ¶¶ 1, 3, 5; *see also id.* ¶ 78 (alleging that parties' consent to Judge Minehart's assignment "did not jibe with their pre-determined, sensationalist sales and marketing strategy"); *id.* ¶ 86 (asserting that Defendants accused Judge Minehart of "restricting the public's access to the Gosnell trial" in order "to further support their pre-determined sales strategy for the Gosnell Book").

A plaintiff cannot plead actual malice simply by alleging falsity combined with a supposed economic motivation to distort the truth. As the Supreme Court has explained, the mere fact that allegedly false and defamatory material was published "in order to increase profits" does not "suffice to prove actual malice." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *see also Taha v. Bucks Cty.*, 2015 WL 9489586, at *5 (E.D. Pa. Dec. 30, 2015) (allegations that websites that posted allegedly erroneous arrest information "'were a scheme by Defendants' aimed at maximizing profits and 'they don't care who gets hurt,'" even if accepted as true, did "not suffice to prove actual malice"). Thus, "the mere presence of some ulterior motive -- whether a profit motive, a motive to produce the most interesting stories, or a personal desire to harm the subject of a story – is not enough to support a finding of actual malice." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 596 (D.C. Cir. 2016).

Under these particular circumstances, the suggestion that actual malice can be inferred merely from the Defendants' supposed economic motivation is especially weak. In this lawsuit,

27

Judge Minehart complains about two relatively tepid paragraphs in a 318-page book that, as the Complaint makes clear, is replete with strong and attention-grabbing language castigating the conduct of other people. *See, e.g.*, Compl. ¶¶ 66-69 (describing lurid depictions of Gosnell's conduct, as well as strong condemnations of the bureaucrats, police, and medical establishment that the Book faults for enabling that conduct). Against this backdrop, the Complaint's suggestion that the alleged inaccuracies about Judge Minehart were a deliberate strategy to increase book sales defies "common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and simply does not "raise [the] right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Complaint fares no better with its second theory of actual malice – that Defendants published the challenged statements despite the alleged existence of publicly available information that would have shown those statements to be false. *See, e.g.*, Compl. ¶¶ 75-77 (docket entry indicating prosecution consented to Judge Minehart's assignment); *id.* ¶ 82 ("simple Google search" of news about Judge Minehart's prior cases); *id.* ¶ 83 ("well-known fact that McMahon has not had a drink for almost twenty years"); *id.* ¶¶ 87-89 (provision of Pennsylvania Rule of Criminal Procedure 112 barring cameras in criminal proceedings).

This, too, is insufficient as a matter of law. These allegations simply criticize Defendants for failing to investigate and uncover sources of information that (according to Judge Minehart) would have disproved their reporting. It is black-letter law that "failure to investigate, standing alone, does not constitute actual malice." *Tucker*, 237 F.3d at 286; *see also, e.g.*, *St. Amant*, 390 U.S. at 730 (plaintiff "fall[s] short" of establishing actual malice where defendant had "no

personal knowledge" of reported activities and "failed to verify the information with those . . . who might have known the facts").[6]

The Seventh Circuit's decision in *Pippen* illustrates precisely why Judge Minehart's claims fall short at the pleading stage. 734 F.3d 610. There, the court affirmed dismissal of a complaint for failure to adequately plead actual malice in a case in which a former basketball star brought suit based on reports that inaccurately stated that he had filed for bankruptcy. In affirming dismissal, the court noted that "Defendants had many ways to learn whether Pippen had filed for bankruptcy," including by searching "bankruptcy court dockets" or engaging in "the tried-and-true journalistic practice of asking a story's subject." *Id.* at 614. The court even observed that: "[i]f rather than relying on the rumor mill the defendants had conducted even a cursory investigation, they would have discovered that Pippen had not declared bankruptcy." *Id.* The court nonetheless held that actual malice had been inadequately pleaded, explaining that "failure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth." *Id.*; *see also Schatz*, 669 F.3d at 56, 58 (affirming dismissal of plaintiff's complaint on actual malice grounds because allegations that defendant reprinted previously published allegations without "'any additional investigation' to determine whether what was said was true" were insufficient as a matter of law). In other words, factual allegations that readily accessible public information existed and that a defendant failed to look for that information are not sufficient to plead actual malice as a matter of law. Like the plaintiff in *Pippen*, Judge Minehart's Complaint fails to state a viable claim as a matter of law.

---

[6] This same point applies to the Complaint's criticism of Defendants for not "interview[ing] Judge Minehart before publishing the Gosnell Book" and not "giv[ing] him an opportunity to address their many [alleged] fabrications." Compl. ¶ 79. Any such failure would not amount to actual malice. As noted above, "even an extreme departure from professional standards, without more, will not support a finding of actual malice." *Tucker*, 237 F.3d at 286.

Public official libel plaintiffs, like any other litigants, are not entitled to proceed to discovery to determine whether they *might* have a claim. They must first allege facts that plausibly support the existence of a claim. Judge Minehart has failed to do so with respect to the fault element of his defamation and false light claims. Accordingly, those claims should be dismissed.

## III.   Judge Minehart's Civil Conspiracy Claim Must Be Dismissed

Finally, Judge Minehart's claim for civil conspiracy fails as a matter of law, as well. First, because Judge Minehart cannot state a claim for the underlying causes of action he asserts, he cannot state a claim for conspiracy either. *See Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004) ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." (quoting *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. 2000)). Thus, Judge Minehart's civil conspiracy claim should be dismissed on this ground.

Second, even if Judge Minehart had adequately stated claims for defamation or false light (which he did not), he has failed to plead an essential element of a conspiracy claim, as this Court already ruled in dismissing PMA in connection with Judge Minehart's remand motion. To state a cause of action for civil conspiracy under Pennsylvania law, a plaintiff must allege: (i) a combination of two or more persons acting with a common purpose to commit an unlawful act or to do an otherwise lawful act by unlawful means; (ii) an overt act done in furtherance of the conspiracy; and (iii) legal damage. *See, e.g., Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. 1997). Proof of malice, an intent to injure, is also essential. *See, e.g., Doltz v. Harris & Assocs.*, 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003). In the context of a civil conspiracy claim, malice requires a plaintiff to prove "that the conspirators act with the *sole purpose* of injuring the plaintiff." *Sarpolis v. Tereshko*, 625 F. App'x 594, 601 (3d Cir. 2016) (emphasis

added); *see, e.g., Arsenal, Inc. v. Ammons*, 2014 WL 6771673, at *4 (E.D. Pa. Dec. 2, 2014) (Brody, J.).  As this Court has determined, Judge Minehart has "disclaimed that any purpose of the civil conspiracy was to injure Judge Minehart."  Feb. 14 Order.  Consequently, that claim must be dismissed as to all Defendants.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Honorable Court grant their Motion to Dismiss and dismiss all claims alleged against them with prejudice.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By:  /s/ Michael K. Twersky
Michael K. Twersky
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Telephone: (215) 299-2000
Fax: (215) 299-2150
mtwersky@foxrothschild.com

Jonathan D. Christman
Benjamin H. McCoy
10 Sentry Parkway
Suite 200, P.O. Box 3001
Blue Bell, PA 19422
Fax: (610) 397-0450
jchristman@foxrothschild.com
bmccoy@foxrothschild.com

*Attorneys for Defendants*
*Regnery Publishing and*
*Salem Media Group, Inc.*

Dated:  May 21, 2018

**BALLARD SPAHR LLP**

By:  /s/ Michael Berry
Michael Berry
Paul J. Safier
Elizabeth Seidlin-Bernstein
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
Telephone: (215) 665-8500
Fax: (215) 864-8999
berrym@ballardspahr.com
safierp@ballardspahr.com
seidline@ballardspahr.com

*Attorneys for Defendants Ann McElhinney,*
*Phelim McAleer, and Ann & Phelim Media*